Uhiet Justice Marshall
delivered the opinion of the Court.
Sometime previous to the year 1844, Milton Young sold to L. W. Kincheloe a tract of land in Nelson county for the sum of $16,000. On the 24th of August 1844, about eight thousand dollars of the purchase money having been paid, Young then residing in Union county, made a deed conveying the land to Kincheloe, for the recited consideration of $16,000 “paid and secured to be paid,” and at the same time Kincheloe executed to him a mortgage conveying the same land, and a house and lot in the county of Muhlenburg, and a negro woman slave, to secure the residue of the purchase money payable in instalments, the last of which was due in February 1848. Kincheloe had his deed lodged for record In the Clerk’s office in Nelson county on the 31st of August, seven days after its date. The mortgage to Young was recorded in the Clerk’s office of the Court of Appeals at Frankfort on the 2d day of September, nine days after its date, but was never recorded in the county of Muhlenburg, and was not lodged for record in the county of Nelson until the 7th day of October following its date. In the meantime Kincheloe .took his deed from Young to the city of Philadelphia and upon the faith of the title conveyed, purchased from Wood & Abbot and others a large amount of goods, and ekecuted to Wood & Abbot foi* themselves and in trust for ■ the other vendors a mortgage upon the tract of land in Nelson county, to secure the amount of the several notes for the price of the goods so bought. This mortgage was executed on the 23d day of September,' and was lodged for record in the Clerk’s office of the Nelson *124 Coúhty Court on the 4th day of October, three days-' before the first mortgage was presented there.
Decree' óf Ore Circuit Cónrt, 4 n former deciee of this Court in itvi'n ease.-
In-March 1846, Wood & Abbot filed their bill to fore-dose the mortgage to them, but did not make Young a party. In' May 1846 Young filed his bill to foreclose his mortgage, and did not make Wood & Abbot or any claimants under the other'mortgage, parties to his bill,, ñor to an amended bill;' charging that his deed to Kincn-éloe showed that a part of the purchase money was not paid, but secured to be paid, and that the only security was the mortgage. The two suits were consolidated,, and Young answered one of the amended bills of Wood & Abbot denyingcharg.es of fraud, but they answered none of his allegations- And on these pleadings and several depositions, a. decree was rendered for the sale of the land, and giving to Young the priority in the appropriation of the proceeds.
That decree was reversed by this Court on the ground that Young having answered one of the amended bills of Wood & Abbot, should be considered as a party to their suit, and. that having failed to answer a subsequent amended bill, charging that from the proceeds of the other property in his mortgage besides the land in Nelson, or from other sources, he had received a considerable. part of his debt, it was erroneous do give him the precedence without an account of these alleged payments. And as the consolidation of the two suits was not regarded as making the respective complainants parties to the pleadings of each other, the decree giving precedence to Young wa.s reversed, and the cause remanded with directions that the parties should interplead, &c., (MS opinion, September 1849.)
The reversal seems not to have extended to the decree of sale, and a sale was made at which Young became the purchaser for something more than $8000, being considerably less than his own demand with the accruing interest. On the return of the cause to the Circuit Court, Wood & Abbot filed an amended bill, charging in substance that the deed from Young was *125 an absolute conveyance, and so claimed to be by Kincheloe, both in Nelson county before he went to Philadelphia, and in his negotiations for the purchase of goods there, and that he did not state and they did not know that any part of the purchase money was unpaid, or that there was a mortgage or other lien on the land for it, and that upon this ground he obtained credit for the goods, to be secured by the mortgage to them.
They expressly charge that the deed was made for the purpose of giving Kincheloe credit in Philadelphia to purchase goods — that he told Young at the time, that it was necessary for him to have a good and valid deed, absolute, clear of all incumbrance in order that he should be able to purchase on a credit the goods that he needed, and accordingly the deed was made and afterwards exhibited to them by Kincheloe as an absolute deed, that Young knew that Kincheloe’s credit was not good in Philadelphia for four or five thousand dollars, that he well knew that a deed absolute from him to Kincheloe was necessary to enable him to purchase the desired goods, and he accordingly executed the deed absolute. They charge that the lodging of the deed in the office at Frankfort, when the recording office in Nelson county was much nearer and in the way to Frankfort, was for the purpose of concealing it, as Kincheloe and his creditors resided in Nelson. And that both Young and Kincheloe in the State of Kentucky, and Kincheloe in Philadelphia as above stated, gave out in speeches that the deed was an absolute deed and clear of all incumbrances, and that they had no notice of any claim or lien of Young on the land.
Young in answer denies having made any thing out of the other mortgaged property, which he alleges not to have been worth more than $600, and says the house and lot in Muhlenburg was not worth more than fifty dollars. He says that Louisville is in his way to Frankfort, and that being in Louisville he sent the mortgage to the Clerk of the Court of Appeals by letter, and that as soon as he learned that it was necessary to record *126 it in Nelson comity, lie sent it there, and in a previous-answer adopted in this, he denies any fraud or- intended concealment of the mortgage, and says that when he executed the deed, he was advised that it. gave notice that part of the purchase money was unpaid, but. that to make assurance doubly sure he took the mortgage which he had recorded in the office of the Clerk of this Court under advice that it was legal, and to save the expense of recording in two counties. lie says he did not make an absolute deed to Kincheloe to enable him to obtain a/a/se credit in Philadelphia or elsewhere, for the deed itself shews the land was not paid for, and he is informed and charges that Kincheloe showed the deed to the persons from whom he bought goods, and told them how much was paid and how much was unpaid. And that he had given a mortgage on the land to secure the residue that was unpaid. Plow far the deed was absolute on its face, he says the Court will judge when it sees that a part of the purchase money is unpaid. Pie denies that he intended to enable Kincheloe to obtain a false credit, or to cheat and defraud any person, and says the Writing of the deed and its execution, and the mortgage and where it should be recorded, were all done by and under the direction of W. ITagood, lawyer of Union county, and that he did not intend to abandon his lien by including other property, all together not worlh more than $600, in the mortgage.
Young did not make this answer a cross bill, nor in any other manner call upon the other claimants to respond to his allegations. But they find a response, or replication sworn to by all of the beneficiaries in the deed or mortgage, reiterating their former statements, and particularly denying all notice of the mortgage or any lien in favor of Young, and affirming that Kincheloe represented his title to be absolute and unencumbered.
It does not appear that Young was under any obligation by the terms of the contract of sale to make a *127 deed to Kincheloe, when he did make it, or at any time before the purchase money should be fully paid. On the contrary, the inference from the pleadings above quoted, and which is strengthened by the other pleadings and evidence, is that he made the deed for the purpose of giving Kincheloe credit in Philadelphia, and took the mortgage for his own security. In his original bill he makes no reference to his deed or to any lien implied from its terms, but set up the mortgage only and asks a foreclosure. In his amended bill filed in June 1846, he states that the notes secured by the mortgage were part consideration for the land, that he made a deed which shows that a part of the consideration was not paid but secured to be paid, which security he says is the mortgage and no other, and he asks the Court to sustain his lien for the purchase money. And in the answer before noticed, he says he did not intend to abandon his lien upon the land by including other property not worth more than $600. It would seem from these circumstances, that Young looked to the mortgage as the security and lien for his demand, and that he relied on the statement in the deed as merely showing that a paid of the purchase money was not paid but secured, and as putting the public upon enquiry as to the nature of that security. And it appears from the testimony of the attorney under whose advice he acted that he told him such would be the effect of the statement in the deed, but that he nevertheless insisted on the mortgage.
A material question in the case, is whether under these circumstances there was any other lien than that which the mortgage created? If the mortgage gave the only lien, then as it was not recorded in the proper office until after the junior mortgage was recorded, it lost its priority unless the junior mortgagees had actual notice of its existence. If the equitable lien' for the unpaid purchase money arose and subsisted notwithstanding the mortgage taken simultaneously with the execution of the deed, then Young is entitled to the *128 precedence, unless he is precluded from asserting it against the complainants, and has in fact lost it by reason of the circumstances and motives attending the .transaction, and the use which was made of the deed in order to obtain credit in Philadelphia.
Two distinct, liens in behalf oí the same peison, that of vendor and mortgagee, cannot simultaneously ex ist; if the vendor's lien exists the mortgage is ineffectual.
It seems to us that the equitable lien in favor of the vendor for the unpaid purchase money, and the lien created by a mortgage upon the same property for the same debt cannot subsist at the same time as two distinct rights or liens; but that the former being a mere equity founded upon the presumption that the vendor looks to the land as his security for the price, and that the vendee holds the legal title in trust for the vendors payment, if not actually negatived or displaced by the mortgage, which putting the legal title in the vendor makes him the trustee, and gives him an express lien, is merged in and identified with it, and must share its fate. The taking of the mortgage shows that the vendor does not repose upon his equitable lien, but upon the security furnished by the mortgage. And although both apply to the same subject and for the same purpose, or to effectuate the same end, they are so different in their nature that they cannot both subsist at the same time, because the very facts which constitute the one destroy or are inconsistent with those on which the other must rest. The one is an equity in the creditor against the debtor who is the holder of the legal title, the other is a legal title in the creditor against which the debtor has only an equity. The former is implied because the vendor has placed the legal title in the vendee without security. The latter takes away the whole ground of the equity by restoring the legal title to the vendor, and takes away the necessity and indeed all room for implying either a lien or a trust for the vendor, by creating for him an express lien and throwing the trust on him. In a word we suppose that, the taking of an express lien upon the land to secure the purchase money, is inconsistent with the idea that the implied lien on the same land and for the same pur *129 pose.is relied on, and is therefore a waiver or renunciation of it. In this view there was no other lien for Young’s purchase money but the lien of the mortgage. This was in fact the understanding of the parties as well as the conclusion of the law. And the subsequent miscarriage of the mortgage could not create or revive the equitable lien.
BroüCtweU King (3 B. Mon roe, 449) overruled by the case of Thornton vs Knox’s jEx’r: (7 B. Mon., 76.)
But the question presents itself, whether the mortgage can take advantage of this waiver of the equitable lien and thus make room for their mortgage, without showing that before its date they knew of the waiver, and whether this knowledge would not imply notice of the prior mortgage which made the waiver, and would , not on that ground postpone their mortgage. But if the execution and acceptance of the mortgage was in fact a waiver of the equitable lien which might otherwise have existed, such lien could not be created or revived by the ignorance of the complainants that there had been a waiver or that it was caused by the acceptance of a mortgage on the same land. And unless they knew that there was a lien {which in this case never existed,) it was not necessary that they should have known of its waiver, in order to make them innocent purchasers or mortgagees. If the conveyance of title which Kincheloe exhibited to them be taken as notice to them that a part of the purchase money was unpaid, and that there might be an equitable lien on the land for it, it did not give them notice that there was in fact such lien, which in fact was not the case. And the most that can be said is, that having notice that part of the purchase money was unpaid, and that there might be an equitable lien for it on the land, they took the mortgage at their peril, running the risk of there being such lien, (Thornton vs Knox's Executors, 6 B. Monroe, 75,) and as it turns out that there was none, in consequence of a mortgage having been taken* they may avail themselves of the fact without showing or admitting that they knew of the cause, or even that they knew when they took their mortgage whether *130 there was or ever had been a lien. Are they then to be charged with notice of the mortgage, because it was by taking the mortgage that the lien was waived? The deed certainly gave no notice that there was a mortgage upon the same land, but only that Kincheloe was indebted for it, and that the debt was in some manner secured.
About one year prior to the date of this deed, this Court (in Broadwell vs King, 3 B. Monroe, 449,) had expressed the opinion that such a recital was not an implied notice of a lien, nor sufficient to put the subsequent purchaser on enquiry to ascertain its • existence. It was not until some year or two after this deed was executed, that a contrary doctrine was established in the cases of Thornton vs Knox’s Executors, (6 B. Mon. 75,) and Woodward vs Woodward, &c., (7 B. Mon. 116,) &c. And we understand that in Pennsylvania the implied lien of the vendor is not recognized by the Courts or the law; (4 Kent’s com. page 152, note e, 7 Serg. & Rawle 64; same 286.) The Philadelphia merchants who gave credit to Kincheloe on the faith of this deed and took a mortgage on the land, might well have supposed as they aver that he represented and they did believe, that the deed, conveyed an absolute unincumbered title, and that there was no lien. And even if they made no enquiry in' reference to it, the omission could not have been regarded as a breach of any actual duty to themselves or to others. If the vendors equitable lien had in fact existed, their mortgage might notwithstanding their ignorance, have been made subordinate to that lien, because according to the law of this State, the deed giving them notice that a part of the consideration was unpaid, implied the existence of a lien unless it had been waived released or abandoned. With this constructive notice of a lien, and with the presumed means and motive for ascertaining whether there was or was not a lien, they would in support of the lien have been subjected to the same consequences as if they had actually enquired, and ascertained its exis *131 tence. And as it is immaterial for this purpose whether they actually knew the facts, or with the means and motive for knowledge remained ignorant, the law does not assume that there was actual knowledge, but upon the ground of constructive notice or means of knowledge, applies or enforces for the particular purpose, the-consequences of actual knowledge.
But the particular purpose is the support and enforcement of a lien, of which the party had or might, and ought to have had knowledge. And if it has ever been assumed for any purpose but that of enforcing the lien or its consequences, that the subsequent purchaser was chargable with a knowledge of the particular circumstances which might have affected the existence of the lien, so as to enforce against him the consequences of-such knowledge in a distinct collateral proceeding, we are ignorant of any case in which it has been done, even where the lien actually existed. But it would be going much farther than this, to say that because the face of the deed gives implied or constructive notice, not that there is but that there may be a lien, therefore although the lien to which this notice refers never existed or was waived, the subsequent purchaser must be presumed to have known of the existence and nature of the facts or of another lien, (a mortgage for instance) which prevented the first from arising or constituted a waiver of It; and it would be going still further to say that such presumed notice of the mortgage should have the same effect as’ actual notice. If this were so, it was not necessary that Young’s mortgage should -have been recorded at all, in order to secure to It, a precedence over all conveyances of the 'land . by Kincheloe. And as the fact that the mortgage is on the same land conveyed by the deed which gives implied notice of a possible lien, can have no bearing upon the extent of the knowledge which is to be imputed to the subsequent purchasers, it would follow from the proposition just stated, that if Young’s mortgage had not embraced the land for which the purchase money *132 was in part unpaid, but had conveyed for its security a different tract o'f equal value and had expressly waived any lien upon the land for which the money was payable, the subsequent purchaser of both tracts from the mortgagor, being informed by his vendor’s deed for- one of the tracts, that a part of the consideration for it was not paid, but secured to be paid, would on this ground alone be affected with notice of the mortgage and would be bound to submit to it, and although it had not been recorded, and although' he never in fact had heard of it, or that if he does not purchase the mortgaged land but buys the tract which is'unpaid for, still under the doctrine that as he knew it was not paid for, h.e should have enquired, and must therefore be assumed to know the,particulars of the facts which relieved it from the equitable lien in favor of the original vendor, he must still be assumed to have known of the mortgage, and would be affected by that knowledge and chargable with it in any subsequent transaction in which his knowledge of the mortgage might be material. And if the existence of a mortgage which the law requires to be recorded as the means of riotice, may be thus made known with effect, without either a notice by the record or a direct communication of the fact, all other facts'and transactions material to the question of lien may, although there was in fact no lien, be equally assumed to have been ascertained by the enquiry which the constructive notice that there might be a lien, would thus impose upon the subsequent purchaser. This would be carrying the doctrine and the effect of implied notice to an unprecedented, and as we think a most dangerous extent, and in its consequences would produce such confusion and-uncertainty as would greatly and injuriously clog the alienation of property and embarrass' the common transactions of men.. The subsequent purchaser with knowledge that his vendor has not paid for the land, holds subject to the equitable lien existing at the time of his purchase, unless upon appeal to the proper sources of information he has been misinformed, and induced to believe that *133 there is no lien ; and if he does not enquire, he purchases at his peril, and is subject to the lien unless he shows that it has been in some manner discharged. But his failure to enquire cannot make a lien where there is none, provided he can disprove its existence when the contest comes. And if the lien exists, his failure to en-quire subjects him to no consequence but that of yielding to the lien, the existence and extent of which he might have ascertained by such enquiry as was opened to him by the facts of which he was apprised by his vendor’s title deed. If in this case the complainants gave the credit and took the mortgage without enquiry, they incurred the hazard of being compelled to yield the precedence to Young’s equitable lien as vendor if it existed. They incurred also the peril of yielding to a prior mortgage duly recorded. But as there was no such lien or mortgage, and their mortgage was first recorded, it seems to us that nothing short of such knowledge of Young’s mortgage as in the view of the Chancellor affected their conscience and made it inequitable in them to seek the priority or to avail themselves of it, could authorize the postponement of their claim to his. Even if they had believed that Young had an equitable lien prior to their mortgage, and expected therefore to be postponed to him, this would not preclude them from claiming the precedence when they afterwards discovered that there was no such equitable lien, and espe_ cially when they discovered that the land sold at $16,-000, and half paid for to Young was not worth the residue of the purchase money. If they believed from the face of the deed that there was no lien for the unpaid purchase money, then of course there was no violation of good faith or moral duty, either in taking the mortgage, or in claiming precedence for it over the mortgage of Young, unless they had actual notice of it. Upon either hypothesis, we think there is no ground for imputing to them the knowledge of any part of the transaction between Young and Kincheloe, further than such knowledge is conveyed by the deed between those ties, or was actually communicated to them.
Young sold a tract of land to Kincheloe tor $16,000, rec’d $8,000; conveyed the land, reciting a consideration of $16,-000 paid and secured to be paid, with a knowledge that K Intended to buy goods at Philadelphia upon the ■credit of that conveyance. Y took a mortgage upon the land lor the unpaid purchase money, it bought goods in Philadelphia, ■mortgaged the ■land, and the lat ter mortgage was (first recorded; Held that the lat ter mortgagees, ¡having no notice «f Y’s lien by (mortgage should have priority.
Recurring then to the .evidence, we find that Kincheloe states that he told the mortgagees in Philadelphia, before executing the mortgage to them, how much he had paid, and how much remained unpaid for the land, and that he had’ given to Young a mortgage on it to secure the unpaid balance.
This deposition appears to have been taken by the complainants, but was repudiated by them by an endorsement on it before the hearing, and was offered by the defendant and admitted, properly as we-think, by the Court, to be read by him, though objected to by the complainants. We are of opinion, however, that no other consequence should be given to the fact that the deposition was taken by them, but that they are thereby precluded from disputing the competency or impeaching the general character and credit of the witness. Even this last restriction might, in certain cases, be a great hardship. And as there was no attempt to impeach the general character or credit of Kincheloe there is no decision upon the, right to do so. He was the person of all others peculiarly cognizant of all the facts pertaining to the transactions between.Young and himself, and between himself and the complainants assuming that he was a man of veracity, he was the person naturally to be appealed to for a correct detail ■of all the facts. The concession of veracity implied in such an appeal, is perhaps nothing-more than is prima facie due and conceded to every respectable man, and certainly does not preclude the party so appealing from disproving by direct or indirect testimony the statement actually made by the witness.
. Young as already stated, says in his answer that he is informed and charges that the. complainants Were told of his mortgage, &c. But he did not make them defendants to any of his pleadings, and although they swear to their response or replication to his answer, and deny any such notice, their voluntary oath is not entitled to' the effect of an answer called for by the opposite party. But taking this question upon the evi *135 dence alone, and upon such inferences as may be fairly drawn from the conduct of the parties, we are of opinion that the statement of Kincheloe to which we have referred though not susceptible of direct disproof, is inconsistent with his own declarations with respect to the nature of his title made in Nelson county just after procuring the deed, and in some instances to the Philadelphia merchants or their clerks from whom he obtained the goods, and that while it stands wholly uncorroborated, it is contradicted not only by these declarations, but by its inconsistency with his" object'in obtaining the deed and carrying it to Philadelphia as shown by his own statements and by the circumstances of the case, from the execution of the deed to the recording of the mortgage.
In the first place his object in obtaining the deed was that he might be .thereby enabled to get credit, in Philadelphia. He says he wanted to make his payments for the land available as means of credit; and Young only denies that he intended to give Kincheloe a. false credit. As it was the intention of both that Kincheloe should make use of the deed to obtain credit, the fair course would have been to show upon its face what was due and to reserve an express lien, instead of putting an equivocal notice in the deed, not intended nor expected to be evidence of a lien, but merely to direct' enquiry to the security taken, which security.was placed on record where the law did not require or authorize it, and where it would not be searched for,' and it could not have been found by enquiry at the proper place. Then Kincheloe says he did not know that the words relied on as giving this equivocal notice were in the deed. He supposed therefore, as Young also seems to have done, that it conveyed the title absolutely and free of incumbrance, and that the mortgage was the only evidence of an incumbrance upon it. And having had his deed recorded in Nelson where there, was no record Of the mortgage, he represented to several persons in that county that Young had made him an *136 absolute deed, releasing all lien or claim on the land, that his debt for the purchase money was as his other debts, and that Young had no more claim' on the land than the pei’sons addressed’had. He at the same time avowed his intention to get credit in Philadelphia upon a mortgage of the land, and on the ground of these statements requested and obtained from one of the persons to whom 'they were made, letters of recommendation to his friends, merchants of Philadelphia, and some of the very persons from whom he obtained credit, and to whom he.gave the mortgage as security. If to gain or keep up a credit in Nelson, and to procure a recommendation to the Philadelphia.merchants, he concealed the fact of the mortgage and repesented his title as free from incumbrance, it is not probable that he would have communicated the true state of the case to the persons themselves from whom he desired the credit.
But further, the witness who wrote these letters, and who says that Kincheloe on his return stated that he had delivered them, says that in the letters he represented the land to be worth eight thousand dollars. And there is no evidence in this record that it was worth more than about that sum. Such is the estimate of the witnesses who speak on the subject, and the considerar tion of $16,000 mentioned in the deed is delusive unr less.accompanied by, a statement of the length of credit* Then did Kincheloe when applying to the Philadelphia merchants for a credit of some six or eight thousand dollars, upon a mortgage of this land which his letters of recommendation stated to be worth $8000, inform them that it was already mortgaged to Young for that sum, its full value ? Or would they upon such a representation have given him credit for any considerable sum on the. faith of a second mortgage of the same land? This is scarcely credible. And the clerks and salesmen in two of the houses from, which he obtained goods depose, in substance, that he s.tated that he. had an absolute deed, free of incumbrance, and that the credit was given mainly on this, ground. .Under, these *137 considerations we cannot regard Kincheloe’s statement ■uncorroborated inconsistent with the established facts in the case, and almost directly contradicted by two witnesses, as being sufficient to establish the fact in opposition to the denial of the complainants, that he informed the mortgagees that he had mortgaged the land to Young for $8000 the unpaid purchase money. Even if he did not (as he said he had done,) deliver the letters of recommendation stating the value of the land at $8000, this fact would not only convict him of an additional false statement, but would also strengthen the conclusion authorized by the whole tenor and complexion of his conduct, that he intended to make the deed and his representations concerning the land the basis of a false credit. And in both points of view it detracts from the weight of his testimony.
We remark further, that although Young denies that he made the deed for the purpose of enabling Kincheloe to obtain a false credit. Yet it is certain that he made it for the purpose of enabling him to obtain credit on .the faith of the deed and, as may be inferred, to the extent of the payments he had made on it or of such portion of the amount as he might deem expedient. At any rate he knew that this was his object, and he ■knowingly put it in his power to accomplish it. And as his deed made for this purpose does not .limit the extent of the power, unless by doubtful implication, it would seem not unreasonable to say that Kincheloe was authorized by him to pledge the land at least to the extent of the payments he had made for it. And that the complainants giving credit and taking their mortgage on the faith of the deed and of Kincheloe’s representations, have an equity which should prevail, even .against Young’s equitable lien for the balance of the purchase money, if that had not been waived by taking the mortgage. And that in this contest between the two mortgages, theirs is entitled to prevail not only upon the ground of legal precedence acquired by priority of record, but also upon the ground of equity arising ’ *138 from the fact that Young made the deed to Kincheloe for his mere accommodation, in order to enable him to obtain credit to the extent that he had paid for it or at his discretion, and without apprising the public of the extent of his own claim upon the land.
Hardin, Linthicum, and Harlan, for plaintiff; Hite, Riley, and Grigsby, for defendants.
We are satisfied therefore, that nothing less than actual knowledge of the existence of Young’s mortgage before they took their mortgage should deprive the complainants of their legal priority, and as there is no sufficient evidence of such knowledge they were properly allowed the precedence by the decree under revision. Wherefore said decree is affirmed.